925 F.2d 1339
 59 USLW 2577
 Kevin H. ANSLEY, Plaintiff-Appellee, Cross-Appellant,
v.
Walter C. HEINRICH, in his official capacity as Sheriff of
Hillsborough County, Florida, Harold E. Winsett,
Gerald Onheiser, Defendants-Appellants,
Cross-Appellees.
 No. 89-3468.
 United States Court of Appeals,
Eleventh Circuit.
 March 11, 1991.
 
 David J. Farash; George A. Vaka and Hala Mary Ayoub, Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, Fla., for defendants-appellants, cross-appellees.
 Kirk M. Gibbons, John B. Gibbons and Elizabeth A. Pereira, Gibbons, Smith, Cohn & Arnett, P.A., Tampa, Fla., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Middle District of Florida.
 Before HATCHETT and ANDERSON, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this excessive use-of-force case against law enforcement officers, we affirm the district court, but hold that a jury should seldom, if ever, be instructed on qualified immunity; the availability of a qualified immunity defense is a question of law for the court to determine.
 
 FACTS
 
 2
 Kevin Ansley, a security guard, lived and worked approximately twenty feet from a Circle K convenience store in Tampa, Florida. The Circle K store, which was known as a "high profile" store had been robbed several times in 1987. On June 7, 1987, following a rash of convenience store robberies in Tampa, the Hillsborough County Sheriff's Department conducted a large scale convenience store stake-out including the Circle K store near Ansley's home.
 
 
 3
 The sheriff's department assigned Officers Winsett and Onheiser, two homicide detectives, to stake-out this Circle K store. Before beginning the stake-out, the officers received a short oral briefing regarding the store's location and its history of robberies. Neither officer had received formal training in robbery stake-out procedures nor were they aware of the Sheriff's Department's written policies and procedures regarding stake outs. Officers Winsett and Onheiser arrived at the Circle K store on June 7 at 9 p.m. just after dark. They parked their unmarked vehicle across the street from the store, from which point they could see the store's front doors. The officers did not notify store personnel or neighbors of their presence.
 
 
 4
 At approximately 9:15 p.m., Ansley heard and saw suspicious activities in the Circle K parking lot. Ansley assumed the store was once again being robbed, so he left his apartment with his .357 magnum pistol and proceeded toward the store. Upon arriving at the store, Ansley surveyed the parking lot and saw a car with two occupants. As Ansley moved toward the store's front doors, he tucked the pistol under his arm. He then entered the store, summoned the clerk, and assured himself of her safety.
 
 
 5
 From their position across the street, Officers Winsett and Onheiser watched Ansley through binoculars as he moved toward the store's entrance with the large frame pistol pointed toward the ground. The officers also observed Ansley tuck the pistol away as he approached the store. While Ansley was inside the store, the officers drove past the store and parked their vehicle adjacent to the building. From this new location they could no longer see what was occurring inside the store.
 
 
 6
 Ansley spent approximately thirty seconds in the store before proceeding along the alley adjacent to the Circle K store with his pistol in his right hand, hanging halfway between his thigh and knee. As Ansley neared his apartment, Officer Onheiser shouted, "Police officer, freeze" and Winsett yelled, "Sheriff's Office." Ansley turned towards the officers. The record contains conflicting evidence as to whether Ansley raised his right hand containing the pistol when the officers spoke. The officers fired two rounds. The first round hit Ansley in his left side, and the second passed through his right leg. Both officers commanded Ansley to drop his pistol, but Ansley continued staring at the officers for about ten seconds before collapsing.
 
 PROCEDURAL HISTORY
 
 7
 In June, 1988, Ansley filed a civil action for damages in the United States District Court for the Middle District of Florida. He named Officers Winsett and Onheiser, personally, and Walter Heinrich, the Hillsborough County Sheriff, as defendants. Ansley alleged that: (1) Officers Winsett and Onheiser violated his fourth, fifth, and fourteenth amendment rights; (2) Sheriff Heinrich violated his civil rights by failing to establish, follow, or enforce proper robbery stake-out systems and procedures for his officers; (3) Officers Winsett and Onheiser negligently shot him committing a civil assault and battery; and (4) Officers Winsett and Onheiser's negligence was vicariously attributable to Sheriff Heinrich.
 
 
 8
 Officers Winsett and Onheiser filed separate answers from Sheriff Heinrich. All the answers, however, asserted several affirmative defenses including probable cause for the shooting, comparative negligence, and qualified immunity. The district court denied the officers's motions for summary judgment after finding disputed issues of fact surrounding the shooting.
 
 
 9
 At trial, the district court gave the jury separate instructions on each claim. The jury found Officers Winsett and Onheiser each 20 percent liable for the negligence claim and found Sheriff Heinrich 10 percent liable on the negligence claim. The jury further found Ansley 50 percent negligent and reduced his initial $100,000 damage award to $50,000. Additionally, the jury found in the officers' and the sheriff's favor on the constitutional claims and the assault and battery allegations. The district court denied the officers' motions for directed verdicts and judgments notwithstanding the verdict. The officers appeal and Ansley cross-appeals.
 
 CONTENTIONS
 
 10
 The officers contend that the district court erred in denying their motions for directed verdicts and judgments notwithstanding the verdict on Ansley's negligence claim. Specifically, the officers contend that Ansley did not establish a prima facie case of negligence because he failed to prove that the officers owed him a duty to refrain from using deadly force during the attempted arrest.
 
 
 11
 In response, Ansley contends that the facts presented amply supported the jury's verdict on the negligence claim. On cross appeal, Ansley contends that the district court erred in instructing the jury that negligent conduct alone could not be the basis of a section 1983 action and that the district court erred in instructing the jury on qualified immunity.
 
 ISSUES
 
 12
 We address the following issue on appeal: (1) whether the district court erred in denying the officers' motions for directed verdict and judgment notwithstanding the verdict; and (2) whether the district court erred in instructing the jury on negligent conduct and qualified immunity.
 
 DISCUSSION
 
 13
 1. Directed Verdicts and Judgments Notwithstanding the Verdict
 
 
 14
 The officers contend that Ansley did not prove the duty prong of his negligence claim. They argue that under Florida law an officer does not owe a suspect a duty to refrain from discharging a weapon during an attempted arrest. The officers rely on Fla.Stat. Sec. 776.05 which states in pertinent part:
 
 
 15
 A law enforcement officer or any person whom he has summoned or directed to assist him need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest or when necessarily committed in retaking felons who have escaped or when necessarily committed in arresting felons fleeing from justice.
 
 
 16
 According to the officers, if an officer is entitled to use force and does so during an arrest, then the officer has breached no duty. Consequently, the officers assert that the district court erred in allowing the jury to consider Ansley's negligence claim because the duty owed to Ansley was a question of law to be determined by the court.
 
 
 17
 We review the district court's denial of motions for directed verdict or judgment notwithstanding the verdict
 
 
 18
 in the light and with all reasonable inferences most favorable to the party opposed to the motion.... [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 19
 Gregg v. U.S. Industries, Inc., 887 F.2d 1462, 1468-69 (11th Cir.1989) (quoting Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)).
 
 
 20
 The district court denied the officers' motions for directed verdict and judgment notwithstanding the verdict after noting that the evidence presented in the case amply supported the jury's verdict. The principal issue regarding Ansley's negligence claim was whether Officers Winsett and Onheiser had a duty not to discharge their weapon upon confronting him. At trial, both officers testified that Ansley initially approached the store with his pistol pointed toward the ground, and later tucked the pistol away before entering the store. The officers also testified that they did not see Ansley take anything from the store; they could not see Ansley while he was in the store; they heard no sounds from the store indicating that it was being robbed; and Ansley did not leave the store in a hurried manner. Furthermore, the officers testified that Ansley exhibited no show of force. According to the officers, their main reason for shooting Ansley was the fact that he raised his right hand as he turned to face them after they yelled "police, freeze."
 
 
 21
 Ansley's testimony regarding the shooting varied from the officers'. According to Ansley, he did not hear the officers yell, "police, freeze." Ansley testified that he heard a sound and as he turned to determine what caused the sound, he heard a loud double snap from weapons and felt a sharp pain in his right side and then his right leg. Ansley testified that he did not raise his right hand as he turned nor did he act in a threatening manner toward the officers.
 
 
 22
 Florida Statutes Sec. 776.05 allows an officer to use any force reasonably necessary to defend himself or others from bodily harm while making an arrest. Whether the officers' use of force was reasonably necessary is an issue of fact for the jury to determine. City of Winter Haven v. Allen, 541 So.2d 128, 136 (Fla. 2d D.C.A.1989). From our review of the record, we agree with the district court that the jury had ample evidence to support its verdict. Therefore, the district court correctly denied the officers' motions for directed verdicts and for judgments notwithstanding the verdict.
 
 2. Jury Instructions--Negligent Conduct
 
 23
 We turn next to Ansley's contention challenging the district court's instruction regarding negligent conduct. According to Ansley, the district court erred when it instructed the jury on his constitutional claims as follows:
 
 
 24
 You are instructed that negligence, standing alone, is not a constitutional violation. And accordingly, you may not find for the plaintiff on the constitutional complaint, based on that theory, although you will see in these instructions, negligence otherwise may impose liability on the defendants.
 
 
 25
 Ansley asserts that the district court's instruction was clearly erroneous and prejudicial in that the jury was mandated to withhold a viable basis for showing a constitutional violation. Ansley's contention must fail, however, in light of the recent United States Supreme Court decision in Brower v. Inyo County, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). In Brower, the Court concluded that unintended consequences of government action could not form the basis for a fourth amendment violation. Brower, 109 S.Ct. at 1381. Consequently, the district court correctly instructed the jury that negligent conduct alone absent any intentional government conduct could not form the basis of a section 1983 claim premised on the fourth amendment.
 
 3. Jury Instruction--Qualified Immunity
 
 26
 Finally, we address Ansley's cross-appeal which challenges the district court's jury instruction on qualified immunity. Ansley argues that the district court incorrectly submitted to the jury the affirmative defense of qualified immunity. The instruction submitted to the jury reads as follows:
 
 
 27
 Now in this case the officers have asserted a defense that they objectively believed that they were acting in good faith and in accordance with the law at the time ... that plaintiff was shot....
 
 
 28
 Now if you find from the evidence that reasonable police officers could have acted the same as officers Winsett and Onheiser under the same or similar circumstances and that they believed their acts to be lawful, then these officers have prevailed on their affirmative defense of qualified immunity and you should return a verdict in their favor on this claim.
 
 
 29
 Ansley argues that at the time of the shooting, the law concerning deprivation of fourth amendment rights resulting from excessive use force was clearly established. Therefore, the issue of qualified immunity should not have been presented to the jury. Furthermore, Ansley argues that the affirmative defense of qualified immunity is to be determined on an objective reasonableness standard; thus, the officers' subjective beliefs are irrelevant.
 
 
 30
 Since the Supreme Court's ruling in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this court has not specifically addressed whether a qualified immunity defense should be presented to the jury. Consequently, we will review the Supreme Court precedent on qualified immunity and discuss other circuits' rulings on whether qualified immunity should be included in a jury instruction.
 
 
 31
 The affirmative defense of qualified immunity protects public officials, acting within the scope of their discretionary authority and under clearly established law, from insubstantial lawsuits. Butz v. Economou, 438 U.S. 478, 507-08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). In Harlow v. Fitzgerald, the Supreme Court enunciated an objective reasonableness standard for determining qualified immunity. The Court stated: "Reliance on the objective reasonableness of an official's conduct, as measured by clearly established law, should avoid excessive disruption of government and permit resolution of many insubstantial claims on summary judgment." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. The Court further stated:
 
 
 32
 If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal development nor could he fairly be said to 'know' that the law forbade conduct not previously identified as lawful.... If the law was clearly established, the immunity defense ordinarily should fail since a reasonably competent public official should know the law governing his conduct.
 
 
 33
 Harlow, at 819, 102 S.Ct. at 2738.
 
 
 34
 Determining qualified immunity on a motion for summary judgment became troublesome among the circuits, particularly when disputed issues of material facts surrounded the officials' conduct. See BCR Transport Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir.1984) (qualified immunity is a question of reasonableness and the reasonableness determination was properly left for the jury to resolve); Bauer v. Norris, 713 F.2d 408, 411 & n. 6 (8th Cir.1983) (good faith defense depends on the defendant's motivation which is ordinarily a question for the jury). Consequently, two years after Harlow, the Supreme court reiterated the objective reasonableness standard in excessive use of force cases and further stated that "no other circumstances are relevant in the issue of qualified immunity." Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). Nonetheless, the circuits continue to wrestle with the public official's subjective belief in determining the reasonableness of the conduct. Additionally, questions arose whether the district court's ruling on summary judgment was a final appealable order in light of Harlow 's pronouncement that qualified immunity protects public officials from insubstantial claims at the summary judgment phase. See Flinn v. Gordon, 775 F.2d 1551 (11th Cir.1985).
 
 
 35
 Thus, the Supreme Court in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) permitted immediate appeal from the district court's denial of summary judgment to the extent that the ruling turned on an issue of law. The court stated that qualified immunity was in essence "immunity from suits and like absolute immunity it is effectively lost if the case is erroneously permitted to go to trial." Mitchell, at 526, 105 S.Ct. at 2815. The Supreme Court's qualified immunity precedent aims at one goal: to keep the public official out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threat of lawsuits.
 
 
 36
 The Court further stated that a denial of an official's motion for summary judgment based on qualified immunity satisfied the criteria of an appealable interlocutory decision in either of two respects: (1) the district court concluded that taking the official's facts as true, the official's actions violated clearly established law and are therefore not within the scope of qualified immunity; or (2) the district court concluded that given the plaintiff's facts, the official is not immune. Under the first scenario, the Court noted that nothing in the subsequent course of the district court proceeding could alter the court's conclusion that the official's conduct was not within the scope of qualified immunity. Regarding the second scenario, the Court noted that at trial, the plaintiff may not succeed in proving his version of the facts. Thus, the official would escape liability. Mitchell, at 528, 105 S.Ct. at 2816.
 
 
 37
 The Court adopted Harlow 's objective test and Mitchell 's summary judgment analysis in Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Like Harlow and Mitchell, Anderson holds that the qualified immunity defense is a question of law to be decided by the court. Anderson, at 635, 107 S.Ct. at 3034. Yet, neither Harlow, Mitchell, nor Anderson discussed whether the jury, in deciding the reasonableness of the officer's conduct, should receive an instruction regarding qualified immunity.
 
 
 38
 Accordingly, the circuits disagree as to whether qualified immunity should become a part of the jury instruction once the affirmative defense has been denied on a motion for summary judgment. Three circuits have specifically addressed this issue. The Second Circuit in Warren v. Dwyer, 906 F.2d 70 (2d Cir.1990) reviewed the following jury instruction:
 
 
 39
 If you find by a preponderance of the evidence that the defendant Officer Dwyer did not have probable cause to believe that the plaintiff Lamont Warren was committing the criminal offense of 'breach of the peace' that does not end your inquiry.... The defendant may be entitled to ... qualified immunity.
 
 
 40
 Warren, at 74. The Second Circuit did not directly decide whether the district court erred in sending the issue of qualified immunity to the jury because based on the record, the court was unclear whether the jury considered the immunity defense in reaching its verdict. The court, however, addressed the jury instruction on qualified immunity stating:
 
 
 41
 Instructing the jury on both issues may seem redundant. The better rule we believe is for the court to decide the issue of qualified immunity as a matter of law preferably on pretrial motion for summary judgment when possible, or on a motion for directed verdict. If there are unresolved factual issues which prevent an early disposition of the defense the jury should decide these issues on special interrogatories. The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully, is a question of law better left for the court to decide.
 
 
 42
 Warren, at 76. The Second Circuit nonetheless affirmed the district court's instruction after finding that the instructions were not inherently contradictory and did not confuse the jury.
 
 
 43
 Similarly, the Seventh Circuit in Llaguno v. Mingey, 763 F.2d 1560 (7th Cir.1985) reviewed the following jury instruction on qualified immunity. "The law allows a defendant to defend a charge of unconstitutional entry by claiming a good faith belief that, under the circumstances, it was reasonable to enter the Llagunos' home without a warrant. The defendant also must prove that such good faith belief was reasonable." Llaguno, at 1569. The Seventh Circuit stated that qualified immunity is an issue of law for the court to decide. The court noted that the defendant's subjective belief is irrelevant. Thus, the Seventh Circuit concluded that the district court committed reversible error in instructing the jury that the defendants were entitled to a good faith defense based upon their subjective beliefs.
 
 
 44
 In contrast, the Ninth Circuit in Thorsted v. Kelly, 858 F.2d 571 (9th Cir.1988) found that the district court's jury instruction on qualified immunity was not erroneous. The instruction in Thorsted read:
 
 
 45
 The defendant is entitled to a qualified immunity only if he did not know what he did was in violation of law and if a confident public official could not have been expected at the time to know that the conduct was in violation of law. If you find that a reasonable official in defendant's situation could believe his conduct to be lawful, then this element will be satisfied.
 
 
 46
 Thorsted, at 573. The Ninth Circuit noted that at least five other circuits shared its view that qualified immunity from damages may be asserted during trial. Thorsted, at 575; B.C.R. Transp. Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir.1984); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339, 1347-48 (2d Cir.1972); McElveen v. County of Prince Williams, 725 F.2d 954, 956-58 (4th Cir.), cert. denied, 469 U.S. 819, 105 S.Ct. 88, 83 L.Ed.2d 35 (1984); Bauer v. Norris, 713 F.2d 408, 411 & n. 6 (8th Cir.1983); Bledsoe v. Garcia, 742 F.2d 1237, 1240 (10th Cir.1984). Therefore, without approving the wording of the jury instruction, the Ninth Circuit found that the district court did not err in giving the jury an instruction on qualified immunity because the law regarding qualified immunity was fairly and adequately represented in the instruction. Thorsted, at 576.
 
 
 47
 We turn now to Eleventh Circuit law on qualified immunity. Following Harlow, this court in Zeigler v. Jackson, 716 F.2d 847 (11th Cir.1983) announced a two-part test for analyzing a public official's motion for summary judgment based on qualified immunity. In part one, the public official must prove that he was acting within the scope of his discretionary authority when the wrongful acts alleged occurred. In part two, the burden of proof shifts to the plaintiff to show the official's lack of good faith. The district court determines whether the plaintiff satisfies the burden of proof in the second step by ascertaining whether the law was clearly established at the time the public official acted and whether genuine issues of material fact exist. Zeigler, at 849. Accord Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir.1988). The Zeigler/Rich two-part analysis permits the district court to determine as a matter of law, based on the clearly established law at the time the official acted and genuine issues of fact surrounding the official's action, whether the official is subject to a subsequent trial.
 
 
 48
 Additionally, this circuit has stated that qualified immunity is a question of law that may be asserted in three ways: (1) on a pretrial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; (2) as an affirmative defense in the request for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c); or (3) on a summary judgment motion pursuant to Federal Rule of Civil Procedure 56(e). Bennett v. Parker, 898 F.2d 1530, 1535 n. 2 (11th Cir.1990). All three motions precede the trial and require the district court to rule as a matter of law, whether the official is entitled to the defense of qualified immunity. See Bennett, at 1535 n. 2. Such a holding is in accord with Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, which held that the defense of qualified immunity is in essence immunity from suits.
 
 
 49
 In light of these standards regarding qualified immunity, we turn now to the district court's jury instruction on Ansley's section 1983 claim.[1] We review the district court's instruction to determine whether "the charge, considered as a whole, sufficiently instructs the jury so that the jurors understood the issues involved and are not misled." Gregg v. United States Industries, Inc., 887 F.2d 1462, 1468 (11th Cir.1989). A review of the district court's instruction reveals that the court incorrectly instructed the jury on the officers' good faith belief and on the affirmative defense of qualified immunity. Nonetheless, the instructions, taken as a whole, did not mislead the jury. The district court correctly instructed the jury on the clearly established law of excessive use of force. Additionally, the district court's instruction required the jury to determine the reasonableness of the officers' conduct considering all of the facts and circumstances surrounding the case. Furthermore, in its answer to interrogatories, the jury found that the officers did not violate Ansley's constitutional rights given the circumstances of the case. Nothing indicates that the jury found that the officers were entitled to qualified immunity from the lawsuit.[2] In fact, no place in the interrogatories submitted to the jury is qualified immunity mentioned. Obviously, the lawyers did not focus on qualified immunity or seek to focus the jury on qualified immunity issues. Although mentioned during the instructions, we are persuaded that qualified immunity dropped out of the case. The jury knew exactly what the fact issue was. Therefore, we find that the jury instruction, taken as a whole, did not mislead the jury and result in the defeat of Ansley's section 1983 claim.
 
 
 50
 We reiterate that qualified immunity is a question of law for the court to decide preferably on pretrial motions for (1) failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); (2) judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c); and (3) a motion for summary judgment under Federal Rule of Civil Procedure 56(e). Bennett v. Parker, 898 F.2d at 1535 n. 2. Qualified immunity is an affirmative defense from trial and not a defense to liability issues raised during trial. See Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. Accordingly, once the defense of qualified immunity has been denied pretrial due to disputed issues of material facts, the jury should determine the factual issues without any mention of qualified immunity.
 
 
 51
 Furthermore, we follow the teachings of Harlow and Mitchell to instruct the district court on qualified immunity. In Harlow, the Supreme Court stated that the immunity defense should fail if the law governing the official's actions has been clearly established. In this case, the officers asserted qualified immunity as a defense to Ansley's constitutional claim based on the officers use of deadly force. At the time of Ansley's trial, the law regarding an officer's use of deadly force during an attempted arrest was clearly established in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Thus, the district court correctly denied appellant's motion for summary judgment based on qualified immunity.
 
 
 52
 Following the district court's denial of a public official's motions for summary judgment, Mitchell v. Forsyth allows the public official an immediate appeal of the summary judgment ruling. Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. If the district court's denial of the motion for summary judgment is affirmed on appeal, the case goes to trial without mention of the affirmative defense of qualified immunity.
 
 
 53
 On the other hand, if this court reverses the district court's denial of the motion for summary judgment, the public official is entitled to qualified immunity and the case is at an end. Mitchell, at 528, 105 S.Ct. at 2816. Harlow further states that if the law is not clearly established, the official is entitled to summary judgment regardless of factual disputes. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 54
 As stated in Mitchell, the district court's denial of an official's motion for summary judgment determines one of two things: either the official's actions, in light of the facts asserted by the official, violated clearly established law and are therefore not within the scope of qualified immunity, or, assuming the plaintiff's facts are true, the official is not immune. Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816. In this case, the district court denied the officers' motions for summary judgment after finding disputed issues of fact surrounding the officers' and Ansley's conduct at the time of the shooting. The main factual dispute was whether Ansley raised his right arm containing the pistol as he turned towards the officers. The district court's denial of summary judgment rested on the fact that the officers were not immune if Ansley proved his statement of the facts at trial.
 
 CONCLUSION
 
 55
 Although the district court incorrectly mentioned qualified immunity to the jury, the court's instruction, taken as a whole, did not mislead the jury on Ansley's section 1983 claim. In other rulings, the district court did not err.
 
 
 56
 The district court is affirmed.
 
 
 57
 AFFIRMED.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The district court instructed the jury, as follows:
 Now, rather, the acts of the officer making an arrest are to be measured by the test of what a reasonable police officer would have believed under the same circumstances.
 As to the plaintiff's claim that he was subjected to excessive force by the officers, you are instructed as a matter of law, that the use of deadly force by the officers in shooting Mr. Ansley violated his civil rights, unless the shooting was reasonable under all the facts and circumstances.
 Now, in order to be considered reasonable, the following elements must exist: First, the officers must have had probable cause to believe that Mr. Ansley posed a threat of serious physical harm to themselves or to others. In other words, if the officers acted in self-defense under circumstances where a reasonable person would believe that his life was in danger or that he was in danger of serious physical harm.
 Now, probable cause, as that term is used here, demands an analysis of the totality of the circumstances by the officers, and each of them, to decide on a practical, common sense basis, whether given all the circumstances known to them at the time of the firing of their weapons, that they could reasonably believe that Mr. Ansley posed a threat of serious physical harm to them and had committed a crime involving the infliction or threatened infliction of serious physical harm.
 Now, probable cause does not demand a showing that the danger which gave rise to the officers' belief actually existed. It is sufficient that the officers reasonably believe in the existence of such a danger and that such reasonable believe is sufficient, even where it is mistaken.
 Now, if you find that the Plaintiff has failed to prove by preponderance of the evidence that the officers acted unreasonably, then your verdict must be for them, that is the Defendants on this particular claim.
 
 
 [2]
 Q. 1. Did either/or both of the following defendants perform any acts which operated to deprive plaintiff of any of his federal constitutional rights? Which acts were legal cause of loss, injury, or damage to the plaintiff?
 A. [Harold E. Winsett?] No. [Gerald Onheiser?] No.
 Q. 2. Did defendant Walter C. Heinrich as Sheriff of Hillsborough County have any custom, policy, ordinance, regulation, or decision which operated to deprive the plaintiff of any of his federal constitutional rights which were a legal cause of loss, injury, or damage to the plaintiff.
 A. No.